## ISAAC N. MORRIS

### *v.*

## ROBERT TILLSON *et al.*

1. CHANCERY—*party must recover on case made in pleadings.* A party in
equity can not recover on a case, not only different from that made by the
pleadings, but absolutely inconsistent with it.

2. AGENCY—*by ratification.* A subsequent ratification in matters of
agency is equivalent to an original authority.

3. SAME—*act of agent can not be ratified in part.* A ratification of an
agreement concluded by an agent can not, in the absence of the express
consent of the opposite party, be limited to a part of the agreement.
The acceptance of a part, with full knowledge of the whole, is constructively
an acceptance of the whole.

4. CHATTEL MORTGAGE—*can not be extended to embrace new matters.* A
chattel mortgage, given to secure certain indebtedness therein expresed, can
not be so extended as to become a lien for the amount of an award for other
and different indebtedness.

5. SAME—*rights of mortgagee as to expenses, etc.* Where a mortgagee is
compelled to replevy mortgaged chattels after default, he will be entitled to
be reimbursed for all necessary expenditures made to acquire possession,

and, if the mortgage so provides, a reasonable compensation for his own time while necessarily engaged in the matter.

6. PAROL EVIDENCE—*to explain consideration.* The general rule is, that the recital of payment of the consideration in a deed for the conveyance of land may be contradicted, provided it is not sought, by the evidence offered for that purpose, to impair the effect of the deed as a conveyance.

7. SAME—*to show consideration of lease.* Parol evidence is admissible to show that a part of the consideration of a lease was for rent past due, as it can not affect or impair the lease in any way, or vary its legal effect.

8. SAME—*on claim of failure of consideration.* Where a chattel mortgage is given to secure the payments specified in a lease of property, and on default of a payment, possession is taken of the mortgaged chattels before the term is ended, and it is claimed by the lessee, who is the mortgagor, that the consideration has failed in part, the mortgagee may show, by parol evidence, that a part of the money provided to be paid in the lease, was for rent due on a prior lease, as showing the consideration has not failed, and this as against a subsequent purchaser of the chattels with notice of the facts.

9. FRAUDULENT CONVEYANCE—*preference of creditor.* The law allows a debtor in good faith to prefer a particular creditor; and a sale to a creditor, even while the goods are in the possession of an officer replevying them under a chattel mortgage, when the creditor is seeking to secure his debt in good faith, is good, after satisfying the prior lien thereon.

10. LIQUIDATED DAMAGES—*not favored in equity.* A court of equity will rarely, if ever, enforce a forfeiture, but usually content itself with compensating the party for what he has lost. A claim for liquidated damages will be refused, where the breach of the contract is the non-payment of money, but interest will be awarded.

11. LANDLORD AND TENANT—*right of tenant to be credited for repairs.* If a tenant makes repairs or improvements on the demised premises in excess of the sum agreed on by the landlord, he can not be allowed credit for such excess as against the rent, though made under the direction of an agent, when the agent had no authority to consent to the same, unless the landlord afterwards ratifies the agent's act or approves of the same.

12. SAME—*damages for not making improvement by landlord.* Where a landlord agrees to complete an addition to hotel property rented by him, but no time is fixed, and the tenant is to pay for the principal part of the cost, the latter can not be allowed damages as against the rent claimed, when it appears he did not pay his part for the work already done.

13. SAME—*what is an eviction by landlord.* The taking possession of hotel furniture by the landlord, under a chattel mortgage given by the tenant to secure the payment of rent due and to become due, upon default of its condition, is not an eviction of the tenant by the landlord so as to terminate the tenancy and stop the rent; neither will any delay in executing

the writ of replevin for the goods, sanctioned by the lessee, or by the officer without authority from the landlord.

14. Acts of a landlord in interference with the tenant's possession, to constitute an eviction, must clearly indicate an intention on the part of the landlord that the tenant shall no longer continue to hold the premises.

APPEAL from the Circuit Court of Adams county; the Hon. JOSEPH SIBLEY, Judge, presiding.

Mr. O. H. BROWNING, and Mr. ISAAC N. MORRIS, for the appellant.

Messrs. SKINNER & MARSH, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

Bill was filed in the court below, by Robert Tillson, against Isaac N. Morris, Edgar R. Morris, Maitland Boone and others, to enjoin certain actions of replevin, and to redeem from a chattel mortgage executed by Boone, on the furniture, etc., in the Quincy House, in the city of Quincy, to Isaac N. Morris, bearing date December 30, 1869.

Isaac N. and Edgar R. Morris filed their joint and several answer to the bill; and Isaac N. Morris also filed his cross-bill, praying that Boone be required to account, etc., to which answer was also filed.

The decree of the court below being unsatisfactory to Isaac N. Morris, the record comes before us on his appeal.

The record is exceedingly voluminous, and the facts somewhat complicated, but, it is believed, the following statement will be sufficient for the purposes of the questions we deem it necessary to discuss.

By three separate leases, all bearing date November 1, 1867, Isaac N. Morris leased to Maitland Boone and Benjamin A. Watson certain rooms in the building known as the Quincy House, for hotel purposes, billiard room, etc., for the term of five years then next ensuing. The aggregate amount of rent to be paid by Boone and Watson on the leases was $6000 per annum, payable in monthly installments; and they were, also, within

one year, to make improvements and repairs to the amount of $5000, to consist, in part, of a brick building of the same height as the Quincy House, and a veranda along the entire north front of the house.

Boone and Watson had been in possession some time before the date of the lease, and they continued in possession after its execution, running a hotel, etc., as partners, until in 1868, when Watson sold out to Boone and retired from the business, with the consent of Morris, Boone assuming to pay Morris all rent in arrear and ten per cent interest thereon.

After this, a short time, Boone and Morris, by agreement, modified the leases so that Morris was, as soon as practicable, to lay a new and sufficient pavement along the whole north front of the premises; reset the stone steps in front of the house, and paint the outside of the house in a proper manner; and Boone was to erect the addition specified in the lease, at such time during his term as he might elect; and, whenever he should erect the building, Morris should be responsible for, and pay, the sum of $1500 towards the expenses thereof, and Boone was permitted to occupy a certain described room free of rent. Morris agreed to not rent the cellar or basement under the north-west corner of the house, for saloon purposes; and Boone agreed to release Morris from all claims for damages sustained by Watson and Boone, by reason of the excavation of a cellar under the north-west part of the building.

In October, 1868, Morris, at the request, as he says, of Boone, entered into a contract with one Roux for the erection of the additional building, who completed the work sometime afterwards. This, as shown by a separate undertaking of Boone, of date October 4, 1868, was to cost $4020, and, payment having been made by Morris, Boone obligated himself to give Morris his notes therefor, less $1500, which Morris was to pay, himself.

Morris constituted Nehemiah Bushnell his attorney in fact, in November, 1869, empowering him to collect the rent due him from Boone, and on the 30th of that month left Quincy

for Washington City, and did not return until September, 1870.

On the 29th day of December, 1869, Bushnell, as attorney in fact for Morris, issued a distress warrant on each of the three leases for sums amounting, in the whole, to $5999.88, for rent then claimed to be due and unpaid, and delivered them to his bailiff, who, on the same day, levied on the furniture and other personal property in the Quincy House belonging to Boone.

This led to negotiations between Bushnell, acting as attorney in fact for Morris, and Edgar R. Morris, also acting as attorney for Morris, and Boone, which were protracted for several days, but finally, on the 31st of December, resulted in a settlement. Tillson was present during a part of the negotiations, and, to some extent, participated therein. A new lease, bearing date December 30, 1869, excluding some of the property embraced in the old leases and including other property not embraced therein, for the term of three years from the first day of January, 1870, was executed by Bushnell and Edgar R. Morris, for and on behalf of Isaac N. Morris, and delivered to Boone. Boone was to pay $6093 in one year, $6000 in two years, and $6000 in three years, to be paid in monthly installments at the Merchants' and Farmers' National Bank, in the city of Quincy, payment of which was to be secured by chattel mortgage, giving Morris a first lien on all the property of Boone.

On the 8th of October, 1867, Boone and Watson had executed a chattel mortgage on all their personal property to Tillson and William W. Watson, to secure the payment of $10,000 to the First National Bank of Quincy, for which the mortgagees were the sureties of the mortgagors. This mortgage had expired, by its own limitation, when the distress warrants were issued; and judgment had been obtained by the bank for the amount of the indebtedness against all the parties to the mortgage.

Boone had executed and delivered a chattel mortgage to

Bushnell for Isaac N. Morris, pursuant to the negotiation before mentioned, and when Bushnell went to the recorder's office to have it placed on record, he found that there had also been filed for record, a short time previously, another chattel mortgage, on the same property, from Boone to Tillson and William A. Watson, to secure them against the judgment in favor of the bank. Bushnell thereupon refused to consummate the negotiations with Boone until this mortgage was released. Tillson was sent for and executed an instrument in writing, releasing the mortgage, in favor of Morris, and the mortgage to Morris was then placed on record. The old leases were canceled, and Bushnell and Edgar R. Morris, in the name of I. N. Morris, executed and delivered to Boone a receipt for all rents, etc., due to that date, and the property levied upon was released.

There is a dispute between the parties whether, in this settlement, the amounts agreed to be paid by Boone, namely, $6093 in one year, $6000 in two years, and $6000 in three years, were solely in consideration of rent thereafter to accrue, or whether they included, also, rent past due, payment of which was thus postponed. Boone claims they were solely for rent to accrue. Morris claims that, in the negotiations, it was agreed there was then due him $5000 on account of rent; that he had paid out, in erecting the additional building, the sum of $1093, which Boone was, by virtue of their agreement of the 4th of October, 1868, to repay him, and that the sum agreed upon for the rent to accrue was $4000 per annum, and that the back rent, $5000, and the amount due by the contract of October 8, 1868, $1093, were added to the total rent for three years, $12,000, making the total $18,093, and its payment was distributed as before stated.

Morris denies that Bushnell and Edgar R. Morris had any authority to make the new lease, or release Boone from the payment of any indebtedness which he then owed. Boone claims that, even conceding the want of authority in Bushnell

and Edgar R. Morris, Isaac N. Morris subsequently ratified all they agreed to.

Sometime about the last of January, or the first of February, 1870, Boone sold a one-half interest in the furniture, etc., of the Quincy House, to George N. Blossom, for $9500, of which he paid $2000, only; and, in the following December, Blossom sold his interest, estimated then at $4000, to Robert Tillson, who also guaranteed him against harm on account of the debts contracted by the firm of Boone & Blossom. Morris never consented that Blossom should have an interest in the leases; he, however, remained in the hotel, during the period of his ownership of the interest in the furniture, as partner of Boone, and, afterwards, as agent for Boone, until Morris replevied the property from Boone.

After Morris returned from Washington, and sometime in September, 1870, he and Boone entered into an agreement to arbitrate certain matters of account, for rent and other things, which Morris claimed were not included in the negotiations between Bushnell and Boone, in December, 1869. Boone, subsequently, and before an award was made, gave notice that he withdrew his consent to the agreement. The arbitrators, nevertheless, proceeded and made an award in favor of Morris, to which we shall again refer.

On the 3d of January, 1871, Boone being, as Morris claimed, in default in the payment of rent, Morris brought replevin for the property described in the chattel mortgage to him from Boone, dated December 30, 1869.

Morris sold, on the 26th of January, 1871, to Edgar R. Morris, as it is claimed, at private sale, for $10,000, on time, and took his individual notes to secure the payment.

When the writ was levied, Boone was absent at Washington. It was then agreed between Morris, by his attorneys, Tillson acting for himself and Boone, and the attorneys of the National Bank having the before mentioned judgment against Boone, Tillson and the Watsons, that proceedings on the writ should be delayed until the 10th of that month, without prejudice to Morris or the sheriff. On the 9th of the month, Boone,

having returned to Quincy, it is claimed, sold the property to Tillson. On the 28th of the same month, Tillson replevied the property from Morris and the sheriff, and, on the same day, Edgar R. Morris replevied from him, and the bill in this case was filed some time subsequently.

Earl was, by consent of parties, appointed receiver, and, on the 5th of May, 1871, sold all the property, except the liquors, cigars and hotel stores, which, by like consent, were delivered to Tillson, to Isaac N. Morris for $10,000.

In order to fix the limit of our inquiries, it is necessary to ascertain, at the outset, whether it is competent for Isaac N. Morris to go behind the settlement consummated between Bushnell and Edgar R. Morris (assuming to act for him) and Boone, on the 31st of December, 1869.

In our opinion, he is, for the purpose of the present controversy, concluded by that settlement. In his answer to the bill filed by Tillson, he alleges: "Although the new lease, made by Bushnell in Morris' name, was without authority from Morris, he, nevertheless, about the 1st of February, 1870, recognized, adopted and ratified said new lease and the chattel mortgage from Boone to him, and they were also recognized and acted upon by Boone and Tillson." And, in his cross-bill, in allusion to this settlement, he says: "Morris was in Washington, and, when informed of this new arrangement, notified Boone that it was unauthorized, and that he would not abide by it, but hold him under the old leases. Boone, however, as long as he remained in possession, claimed under the new lease, but, soon after this, Morris, by the compulsory condition of affairs, was constrained, and did accept the situation, and notified Boone that he ratified the new arrangement."

The lien which he seeks to enforce against the property, is by virtue of the chattel mortgage executed on that settlement; and there is, moreover, no controversy, but that, subsequent to the settlement, he resumed the control of the property which was included in the old leases but was omitted from the new lease, and permitted Boone to exercise control of the property embraced in the new lease and which was not in the old leases,

and that he also accepted rent and gave credit for it on the new lease.

It could hardly be seriously pretended that it is competent for a party to recover on a case, not only different from that made by the pleadings, but absolutely inconsistent with it. And the principle that a subsequent ratification, in matters of agency like those here under consideration, is equivalent to an original authority, is so familiar that there can be no question save whether the facts bring the case within the principle. So, too, we apprehend, there can be no necessity to refer to authorities to support so evident a proposition as that a ratification of an agreement concluded by an agent can not, in the absence of the express consent of the opposite party, be limited to a part of the agreement. It is a unit, and must either be ratified or rejected as a whole; and the acceptance of a part, with full knowledge, is, constructively, an acceptance of the whole.

All matters in dispute between Isaac N. Morris and Boone, therefore, whether relating to the rent claimed to be due for the Quincy House, and mutual claims for damages growing out of the same, or to the private accounts of the parties, will be regarded as settled; and the rights of the parties, so far as the subject of present inquiry, will be regarded as fixed by the settlement concluded on the 31st of December, 1869.

The attempted arbitration between Morris and Boone, which occurred in September and October, 1870, related to matters transpiring prior to the settlement of the 31st of December, 1869, and can not, therefore, be considered. The chattel mortgage under which Morris claims, could not, on any principle we are aware of, be so extended as to become a lien for the amount of an award for indebtedness other and different than that described in and professed to be secured by the mortgage.

The next and most difficult question we have to determine is, whether it is competent to receive parol evidence to show that the consideration named in the lease of date December 30, 1869, to secure the payment of which the chattel mortgage

was given, was, in part, for rent past due; or are the lease and mortgage conclusive that it was for rent to accrue?

The general rule is, that the recital of payment of the consideration, in a deed for the conveyance of land, may be contradicted, provided it is not sought, by the evidence offered for that purpose, to impair the effect of the deed as a conveyance. *Illinois Central Insurance Co.* v. *Wolf,* 37 Ill. 355.

As was said in *McCrea* v. *Purmont,* 16 Wend. 473: "A party is estopped by his deed. He is not to be permitted to contradict it. So far as the deed is intended to pass a right, or to be exclusive evidence of a contract, it concludes the parties to it. But the principle goes no farther. A deed is not conclusive of everything which it may contain, * * * the acknowledgment that the consideration had been received is not conclusive of the fact. *This is but a fact.* * * * It [the acknowledgment in the deed] does not *necessarily* and undeniably prove the fact. It creates no right; it extinguishes none."

It is impossible to say that the lease is in anywise impaired, by proving that a part of the consideration was for rent past due. What are its material parts, as a contract? The letting, the length of the term, the conditions, the amount to be paid, and when paid. The evidence offered has no bearing upon either of these. It is not sought to change the length of the term, the description of the property let, the conditions, nor the time or amount of payment. Whether for rent past due, or rent to accrue, the amounts and the times fixed for payment are precisely the same, and will so remain; the only result being that, in the one contingency, Morris is entitled, upon proper showing, to recover a part of the amount, and in the other he is not.

We are of opinion the evidence is admissible, under the rule referred to. But we are also of opinion, the evidence is admissible on another ground.

Morris claims through the chattel mortgage which is given to secure the payments specified in the lease. Boone and Tillson reply that he can not recover those amounts, because

the condition upon which they were payable has not been per-
formed; in other words, that there is a failure in the consider-
ation for which the promise of payment was made. This
presents an issue which Morris may controvert, by showing
that there was not, in fact, a failure of consideration; and it
is admissible for the parties to give in evidence, notwithstand-
ing the writing, what the actual consideration was. *G. W.
Ins. Co.* v. *Rees*, 29 Ill. 272; *Mann* v. *Smyser et al.* 76 id.
365; *Gage* v. *Lewis*, 68 id. 604.

We regard the evidence as clearly preponderating that
$5000 of back rent, and $1093, which Boone was also liable to
pay to Morris, in consequence of advances made by him to
Roux, under the contract between Boone and Morris of Octo-
ber 8, 1868, were included in the sums provided to be paid by
the lease of date December 30, 1869. Boone denies that such
was the fact, but his evidence, even considered by itself, is not
entirely satisfactory. He admits that Bushnell was claiming,
and that there was, in fact, a large amount of rent due, and
he fails to show how it was all paid. The property in the new
lease, he conceded to be of less rental value than that in the
old leases, and yet, he says, he agreed to pay precisely the same
amount of rent for it. Why did he agree to this? He is com-
pelled, by indirection, to admit that the amount claimed on
the old leases was the cause. He consented to it in consider-
ation that he should be released from liability on the old leases
—that is to say, whatever amount in the new lease is beyond
what he estimated the rental value of the property, he agreed
to pay in consideration of his liability on the old leases; that
much was in satisfaction of the amount due on them. But if
he is right, why is the first payment under the new lease for
$6093, and not for $6000 even, the annual rent, as he says, of
the property?

He is directly contradicted by Edgar R. Morris, who was
present and participated in the settlement, by Isaac N. Mor-
ris, and by McFall. Edgar R. Morris says the annual rental
value agreed upon was $4000, making for the three years the
lease was to run $12,000; and to this was added $5000 of back

rent agreed to be due, and the $1093 due under the agreement of October 8, 1868, making in all $18,093, and that for the accommodation of Boone its payment was extended and distributed so as to be payable, $6093 in one year, $6000 in two years, and $6000 in three years. Isaac N. Morris says that, in conversation with Boone, he admitted to him that this is the way the amounts were arrived at and placed in the new lease.

McFall was one of the arbitrators in the attempted arbitration between Boone and Morris, and he says: "The subject of back rent carried into the new lease was canvassed on every occasion. It was our understanding that $5000 of back rent had been provided for by the new lease, and we had nothing to do with that. That was the general understanding. I received it from the parties concerned—Morris and Boone."

A memorandum was also introduced in evidence, in Boone's handwriting, proved to have been made by him at the time of the settlement, in which he had figured up the amount $18,000, from the same *data*, said, by Edgar R. Morris, to have been used in making the settlement; and there was, also, in evidence a like memorandum in the handwriting of Mr. Bushnell, who is since deceased, proved likewise to have been made at the time of the settlement.

It is equitable that Morris should be allowed the $6093, thus carried into the new lease, the fact that it was for indebtedness past due, making it no less a part of the amount secured by the mortgage than if it had been for rent to accrue.

It is true, if Tillson may be regarded as a purchaser in good faith, without notice of the equity of Morris, he is entitled to rely upon the presumption arising from the face of the lease and the mortgage, that the amounts are to be paid only for rent to accrue; but, with no design to reflect, in the slightest, upon his integrity, we are constrained to hold that he does not occupy the position of a purchaser in good faith, without notice of Morris' equity. That he knew there were back rents due from Boone to Morris at the time of the settlement consummated between Bushnell, Edgar Morris and Boone, on the

31st day of December, 1869, is admitted by his release of his chattel mortgage, executed on that day, in which he recited:

"Which said lease (referring to the lease then executed) the said Morris declines to deliver to said Boone till said first named mortgage is released; and till such release is executed, also declines to waive his prior claim on said mortgaged property for rents due and unpaid on prior and existing leases, made of certain parts of said Quincy House property by the said Morris to the said Maitland Boone and Benjamin A. Watson, and which said property the said Morris has caused to be distrained, and now holds for such back rent."

If the rents were, as he acknowledges, then due, how were they paid? He must have known all about the transaction. Boone was his son-in-law; there was great intimacy and entire confidence between them; they had been in partnership before, the business of which, at that time, was not yet finally settled, and both say that Tillson was fully advised of everything Boone did in this matter.

The fact that Tillson understood the back rent was finally settled, in his conversation with Bushnell, and that Blossom so understood Bushnell to say, we regard, under all the circumstances, as having but little weight to show that Tillson must have understood the lease only covered the future rent for the property.

In one sense the back rent was settled, and all that Boone was to be liable for was shown by the lease. That is, the back rent, by the agreement, had ceased to be an indebtedness past due, and it had become a debt, payable in the future, in connection with rent to become due. Had Boone gone on and faithfully kept his covenants, so as to have avoided a breach of the condition of his mortgage, it would have been of no consequence between the parties, or to others, that the back rent had been added to and consolidated with the amount of future rent, to be paid in the amounts and at the times specified in the new lease. It was not then contemplated that Boone would not keep his covenants; and parties, in speaking of the settlement, would not, ordinarily, find it necessary to specify other than

in general, and, perhaps, not very precise terms, the result of the transaction.

We can not, in view of other evidence in the record, to some of which we have heretofore referred, be persuaded that Mr. Bushnell did not understand the back rent was carried forward into the new lease; and we must, therefore, suppose that in his reference to the settlement, he spoke of it with reference to its effect in the event, which was most likely assumed, that it should be fully carried out by all the parties. But Tillson ought to have known, for the means of information were before him, that the back rent was an element in the new lease, and went to swell the amount to be paid.

When Tillson purchased, the property was in Morris' possession, and he should have gone to him for information as to the extent of his claim.

There is no controversy in the evidence that when the writ of replevin in favor of Morris was first levied on the property, proceedings under the writ were delayed until the return of Boone from Washington, at Tillson's request, acting for himself and for Boone, and upon his guaranty that neither Morris nor the officers should be in any manner prejudiced by this delay. Morris says, in two conversations subsequently had with Tillson, he admitted the property belonged to Morris, and begged that he would be lenient to Boone, in consequence of Boone's family. He does not show by any evidence that he ever notified Morris of his having bought, or of his intention to buy the property from Boone. When he did buy, as before observed, the property had been taken by Morris on his writ, and this, after the recognitions testified to by Morris of his ownership of the property.

We are not, however, prepared to hold that the purchase by Tillson was fraudulent as against creditors, so as to entirely avoid it. The proof is clear that Boone was, and had been for a long time, largely indebted to him. At one time, as has been incidentally stated, he had, in connection with William Watson, a chattel mortgage on the property to secure them as sureties on a claim for $10,000. This, afterwards, passed into

judgment, the payment of which was again attempted to be secured by the chattel mortgage which Tillson released on the 31st of December, 1869. Before the purchase, Tillson had paid that judgment, and Boone had no other means than this property of remunerating him.

There is no evidence of bad faith, other than what is to be implied from a purchase made when the property was in the adverse possession of the officers under Morris' writ. The law allowed Boone, in good faith, to prefer Tillson to other creditors, and the preference was a most natural one. We think the sale good, to the extent of Boone's equitable interest in the property, after satisfying the amount secured to Morris by his mortgage.

In stating an account between the parties, Morris is entitled to the $6093, carried into the new lease, and the amount of rent at the rate of $4000 per annum due from the 1st day of January, 1870, until the expiration of Boone's tenancy. He is also entitled to reimbursement for all necessary expenditures made in regaining possession of the property, under the terms of the mortgage, and to reasonable compensation for his own time while so necessarily engaged.

Claim is made by Morris for $1500, liquidated damages. This is not admissible, according to principles of equity. A court of equity will rarely, if ever, enforce a forfeiture, but usually contents itself with compensating a party for what he has lost. This, in the present instance, will be done by giving him legal interest on the $6093 from the first of January, 1870, and legal interest on the amount due for rent which accrued after the 1st of January, 1870, from the time it was due.

Boone is entitled to be credited with all payments he has made on the lease since January 1, 1870. By the terms of the settlement concluded on the 31st of December, 1869, he was entitled to make repairs, etc., on the Quincy House, subject to the direction of Edgar R. Morris, to the amount of $1500. He is entitled to be credited also with the amount of repairs

so made.  He claims, however, to have made repairs in excess of the $1500.

If such repairs were made, either by the request or with the subsequent approval of Isaac N. Morris, he is entitled to be credited with the amount.  But if repairs were made in excess of that amount, whether with or without the authority of Edgar R. Morris, which were neither requested by Isaac N. Morris, nor subsequently approved of by him, he is entitled to no credit on account of them.  The authority of Edgar R. Morris is limited to $1500 by the agreement, and beyond that it gives him no authority whatever to bind Isaac N. Morris.

Claim is made for damages in not completing the addition to the house within a stipulated time.  So far as the present record is concerned, this claim is without merit, and should be disallowed.  It does not appear that Morris ever covenanted to complete the addition within any stipulated time.  He contracted for the building, and its erection was under the direction of Boone, who was likewise to make repayment of the greater part of the money after it was advanced by Morris, for that purpose, which he does not appear to have done.

There is controversy as to when Boone's tenancy terminated. Boone and Tillson claim that he was evicted when the writ of replevin in favor of Morris was served; while Morris denies that there was an eviction, and claims that the tenancy did not terminate until the 4th of May, 1871, when he gave notice of his election to treat it as terminated.

It does not seem to be seriously controverted, and we shall, therefore, assume such to be the fact, that Morris was fully authorized, under the terms of his mortgage, to proceed, as he did, by his writ of replevin, to possess himself of the property. The service of the writ did not, of itself, operate as an eviction, for Boone had himself authorized the proceeding, and notwithstanding the loss of this property, he might still have enjoyed the use of the premises.  Nor do we think any delay in the officers in executing the writ, unauthorized by Morris, however liable it might render them, could be held to be an eviction by Morris.  So, also, if any delay in moving the property,

or any other act which might otherwise be held to be an eviction, was sanctioned by Boone, it could not be regarded as an eviction.

The rule laid down in *Hayner et al.* v. *Smith and wife*, 63 Ill. 430, and followed in *Lynch* v. *Baldwin*, 69 Ill. 210, and *Walker et al.* v. *Tucker*, 70 id. 528, is, that acts by the landlord, in interference with the tenant's possession, to constitute an eviction, must clearly indicate an intention on the part of the landlord that the tenant shall no longer continue to hold the premises.

Tested by this rule, we are not fully satisfied that the evidence in the record sustains the position that there was an eviction by Morris prior to his giving notice of his termination of the tenancy on the 4th of May, 1871.

The delay in removing the property, from the 3d to the 10th of January, was by consent of all parties in interest, and clearly did not have the effect of an eviction. And the delay for several days succeeding the 10th, is satisfactorily accounted for by the efforts made, and expectations entertained by the parties, that they would be successful in effecting a compromise. After all hope of compromise had ended, it is not clearly shown that any direction of Morris, or any act done by his sanction, without the consent of Boone, unnecessarily delayed the removal of the property, or interfered with Boone's occupancy of the premises. It is, indeed, quite apparent that he was not actually obstructed in any attempt to occupy them, for he made no such attempt; nor, beyond some threats made in passion to sub-let them for a negro boarding house, and for a house of prostitution, he does not appear to have ever manifested any design to subsequently occupy them.

The views we have expressed renders it necessary that the decree be reversed and the cause remanded, and we are of opinion that it will be better that a reference be made to a master to take and report an account.

The decree is reversed and the cause remanded.

*Decree reversed.*