### William M. Gibbons, Appellee, v. Albert Hoefeld, Appellant.

### Gen. No. 24,598.

1. LANDLORD AND TENANT, § 264*—*when constructive eviction takes place.* There can only be a constructive eviction where the premises leased are rendered useless to the tenant or the tenant is deprived, in whole or in part, of the possession or enjoyment of them as a result of the wilful, wrongful act of the landlord, which may be either through the wilful omission of a duty on his part or by the positive commission of a wrongful act.

2. LANDLORD AND TENANT, § 265*—*when landlord's omission of duty will be basis of constructive eviction.* To be the basis of a constructive eviction, the omission of a duty by the landlord or the wrongful act committed by him must be of a grave and permanent character, evidencing an intention on his part that the tenant shall be deprived of the enjoyment of the premises.

3. LANDLORD AND TENANT, § 269*—*when failure to repair constitutes constructive eviction.* Where the landlord has covenanted to repair, and the premises become untenable and useless for the tenant's purposes, for want of proper repairs, and, upon receiving notice of the conditions, the landlord neglects or refuses to make the needed repairs, the tenant may claim a constructive eviction and abandon the premises.

4. LANDLORD AND TENANT, § 206*—*when landlord not required to repair wall.* *Semble*, that in the absence of a covenant to do so, the landlord is under no obligation to repair a wall which is not one of the supporting foundation walls of the building but is a part of the demised premises having no relation to any other part of the building.

---

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Gibbons v. Hoefeld, 216 Ill. App. 282.

5. LANDLORD AND TENANT, § 264*—*when fact that premises become untenable does not constitute constructive eviction.* The mere fact that the tenant's premises become untenable cannot constitute a constructive eviction, if such condition, is not the result of any wrongful act of omission or commission on the landlord's part.  ·

6. LANDLORD AND TENANT, § 326*—*when not error, in action for rent defended on ground of eviction, to direct verdict for landlord.* While the question whether the landlord's acts or omission do or do not amount to an eviction is for the jury if the character of such acts or omissions is ambiguous, an instruction to find the issues for the landlord is not error where there is no evidence in the record showing or tending to show any intention on his part to interfere with the tenant's possession.  ·

7. LANDLORD AND TENANT, § 326*—*when not error, in action for rent defended on ground of constructive eviction, to direct verdict for landlord.* In an action for rent under a lease in which defendant sets up a constructive eviction, where it appears that the landlord engaged competent architects and contractors to remedy the conditions complained of within a reasonable time after they were brought to his attention, such conditions being caused by a leakage which was in no way the result of the landlord's act or omission and being temporary and having been remedied shortly after the tenant left the premises, it is not error to instruct the jury to find for the plaintiff.

Appeal from the Circuit Court of Cook county; the Hon. SAMUEL C. STOUGH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1918. Affirmed. Opinion filed December 31, 1919.

ADLER, LEDERER & BECK, for appellant; AXEL CHYTRAUS, of counsel.

SHEPARD, McCORMICK, KIRKLAND, PATTERSON & FLEMING, for appellee.

MR. PRESIDING JUSTICE THOMSON delivered the opinion of the court.

This is an appeal by the defendant, whom we shall call the tenant, from a judgment for $4,000 recovered by the plaintiff, whom we shall call the landlord, in an action for rent under a lease, which judgment was based upon a directed verdict at the close of all the evidence.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

The material facts are not disputed. The landlord was erecting a 16-story building on Jackson boulevard in the City of Chicago. Shortly before its completion he and the tenant executed a lease covering a part of the first floor and a part of the basement in the building, the first floor to be used by the tenant as a haberdashery shop and the basement as a salesroom for men's clothes. The lease was for a period of 10 years at a quarterly rental of $4,000.

In erecting this new building, a rubblestone retaining wall, at the street curb line, which had been in use in connection with a previous building on the same site, was retained. The landlord's renting agent was one Christine. It was through him that the lease in question was consummated in December, 1912. Christine had a talk with the landlord about this rubblestone wall while the building construction was in progress and before the building was finished. Christine testified that in this conversation he told the landlord he was afraid that wall would not hold and that it would not be waterproof,—that the premises were being rented for clothing purposes and that it would be expected the walls would be tight,—that he was afraid of this basement because he had an experience with a similar wall in the Steger building, adjoining the building involved here, and water came through that wall for 2 or 3 years after the building was constructed. About March 1, 1913, when the tenant was to have possession, it was observed that there was some seepage in the basement of the leased premises and the tenant stated he would not take possession until this condition had been remedied. The landlord or his agent notified the tenant that the condition of the wall would be remedied and that it would probably be about the 10th of the month before the work could be completed. The tenant said if that was done he would take possession. He was later notified that the work had been done and he took possession about the middle of March. Shortly after this some seepage came through the wall onto the basement floor. It was called

to the attention of the agent and he reported it to the landlord and the latter said he would get busy immediately and get his contractor back to repair it, which he did. The agent Christine ceased to act as agent for this building about the middle of April. He testified that while he was there both he and the landlord "did their very best" to make the leased premises fit and habitable. One Dale, a clothing salesman for the tenant, testified that he was located at the store in question from the time it opened in March until the end of June and during that time work was done on this wall twice, in order to make it water-tight. He testified further that during that time they did a very fair business. "There had not been any falling off of business. None at all. We had our normal trade for that time of the year." He testified that during the time he worked at this store, they kept sawdust on the floor between the clothing cases and the wall in question.

One Kitz testified that he was a clothing salesman for the tenant, Hoefeld, at the store in the Gibbons Building beginning soon after he moved in there and until the first week in August when he went on his vacation; that the first time he had occasion to notice anything with reference to this wall was some time in June when, following a rainstorm, water trickled through the wall and practically covered the basement floor; that in some places there was half an inch or an inch of water and a few dry spots in between; that he remembered four or five different occasions when the water would trickle through the wall onto the basement floor.

The defendant Hoefeld testified that on March 1, when he was to have possession under the terms of the lease, the basement was not dry and he was assured the landlord would "proceed to make the premises water-tight"; that on March 10, the basement was still damp; that on March 15, "the premises seemed to me in good condition," and that the agent told him

they had waterproofed the wall so it would not leak any more, whereupon he moved in. The only testimony given by the defendant, covering the period from the time he moved in until "about the beginning of June," was his statement that after he moved in and installed his fixtures and merchandise "the basement continued to be damp." He further testified that "about the beginning of June," water came through the wall and he notified the landlord; that he did not remember whether the notice was oral or in writing. He was asked if the landlord did anything after that first notice, and he answered, "I don't think so." He further testified that the water came through the wall "from time to time" and on June 27 he wrote the landlord about it and he received a reply the following day in which the landlord wrote: "I have taken this matter up with the contractors and they assure me that it will be attended to at once. I am very sorry for any annoyance you may be put to and hope to have it remedied very soon"; that the contractor came in "about the first part of July" and worked on the wall 2 or 3 days; that water came through the wall again "a couple of weeks after that work was finished"; and he then had his lawyer write the landlord. This letter is dated July 14. Following this letter the landlord had his contractor do further work on the wall. Hoefeld testified that he consulted his architects who wrote him that in their opinion the work that was being done on the inside of the wall could not successfully remedy the condition that was present and that the only way to assure absolute immunity from any further disturbance was to open up the street and waterproof the wall on the outside. This letter from Hoefeld's architect was sent to the landlord in another communication from Hoefeld's lawyer dated July 16. Under date of July 17, the landlord replied inclosing a report from his architects saying that the wall had been waterproofed 7 feet above the floor under a contract with the George A. Fuller Company, through their

contract with the Imperial Water Proofing Company, which waterproofing, when first completed, showed some tendency to leak, but was recoated, since which time there had been no evidence of leakage through that portion of the wall. This report further stated that recent leaks had appeared in the upper portion of the wall and that portion was then being waterproofed by the same company, and the architects stated that they had the assurance of the contractors as well as the Water Proofing Company that the work was being done in the most expeditious manner possible and that when completed the wall would be ''bottle tight.'' These architects further stated in this communication to the owner that they had frequently waterproofed walls from the inside ''with perfectly satisfactory results.'' They added that they had the assurance of the Fuller Company that they had done the same thing successfully in some recent operations. This report from the landlord's architects referred to letters attached, from the Chicago Ironite Water Proofing Company and the Imperial Water Proofing Company, giving as their opinions that the inner surface of the wall is the best place to apply the waterproofing, giving reasons and citing buildings on which they had successfully performed that operation.

Under date of July 18, the tenant's lawyer wrote the landlord acknowledging receipt of his letter of the 17th, saying among other things, that ''should the work you are attempting to do not secure to him (the tenant) the permanent immunity from dampness and moisture coming through these walls, we have advised him to vacate the premises and hold you liable for any damages that he may sustain.'' On August 18, there was a very heavy rain and Hoefeld's basement floor was again covered with water and on that day or the next he vacated the basement and on August 25 he removed from the premises entirely and returned the keys to the landlord and wrote him that he was surrendering the premises because of the landlord's

failure to make them tenable in accordance with their previous correspondence. Hoefeld testified that whenever a leak occurred he notified the landlord and the latter had his contractor send his men in to work on the wall and that this happened "three or four times"; that there "never was a time when Gibbons refused to do any of this work"; that he received some allowance on his rent for the first quarter because he could not move in on March 1 but after that no allowance was made nor was any requested by him. Witnesses connected with the Water Proofing Company testified that in their opinion the method used in the work on this wall was the best one; that they were first directed to waterproof the lower part of the wall where the leakage appeared and "about a month" later they were directed to waterproof the wall all the way up. During the progress of their work they discovered a settlement crack in the wall from top to bottom, which they chipped out, filled with cement and covered with waterproofing. After Hoefeld moved out they put in a gutter running to a drain or catch basin in the corner. From the testimony of these witnesses it appeared that the last flooding of the basement floor was due to an old pipe, through the upper part of the wall and flush with it, which had not been properly stopped up. It appears in evidence that the Water Proofing Company was under contract with the Fuller Construction Company to waterproof this wall and in this connection it had given a 3-year guarantee, and it further appears that after the last work done by the Water Proofing Company, before Hoefeld moved out, and after the conduit was cemented up and the gutter provided, the wall had never given any trouble and the basement was entirely dry.

Under the terms of the lease, a quarterly payment of $4,000 was due the landlord from the tenant on September 1, and the landlord brought this suit to recover that instalment of the rent.

In support of this appeal, the tenant, Hoefeld, con-

tends that there was a concealed defect in the demised premises which made them unfit for occupation, which was not ascertainable by an ordinary examination and which was known to the landlord and unknown to him and which the landlord was therefore obligated to reveal to him, and that inasmuch as the landlord did not do so, a provision in the lease to the effect that the taking possession of the demised premises should be conclusive evidence of their good and satisfactory condition, cannot be availed of in this case. As we understand it, the landlord is not attempting to avail himself of that provision in this lease, and furthermore, although the tenant may not have known that the wall in question was one which had been in use in connection with a former building on this site, he did know before he took possession that the wall was not water-tight, and as stated above he postponed taking possession for a time because it was leaking.

The main contention made by the tenant on this appeal is that he suffered a constructive eviction and that that issue was one of fact which should have been submitted to the jury. This question involves the further inquiry as to what constitutes a constructive eviction. There can only be a constructive eviction where the premises leased are rendered useless to the tenant or the tenant is deprived, in whole or in part, of the possession or enjoyment of them, as a result of the wilful, wrongful act of the landlord, which act may be the wilful omission of a duty on his part or the positive commission of a wrongful act. *Barrett v. Boddie,* 158 Ill. 479; *Keating v. Springer,* 146 Ill. 481. To be the basis of an eviction, the omission of duty on the part of the landlord or the wrongful act committed by him must be something of a grave and permanent character, evidencing an intention on his part that the tenant shall be deprived of the enjoyment of the demised premises. *Hayner v. Smith,* 63 Ill. 430; *Morris v. Tillson,* 81 Ill. 607; *John Anisfield Co. v. Covey,* 140 Ill. App. 364. Where the landlord has covenanted to re-

pair, and the premises leased become untenable and useless for the tenant's purposes, for want of proper repairs, and, upon receiving notice of the conditions, the landlord neglects or refuses to make the needed repairs, the tenant may claim a constructive eviction and abandon the premises. 1 Taylor's Landlord and Tenant, sec. 330; *Bostwick v. Losey*, 67 Mich. 554; *Leonard v. Armstrong*, 73 Mich. 577; *Pierce v. Joldersma*, 91 Mich. 463; *Sloss v. Brockman*, 171 Ill. App. 465; *Nelson v. Richoff* (Okla.), 158 Pac. 370; *Tallman v. Murphy*, 120 N. Y. 345; *Vincent v. Central City Loan & Investment Co.*, 45 Tex. Civ. App. 36, 99 S. W. 428.

But in the case at bar, the landlord made no covenant to repair and in our opinion he was under no legal obligation to repair the wall in question. This wall was not one of the supporting foundation walls of the building. It was located out under the sidewalk at the street curb line. It was a part of the demised premises and had no relation whatever to any other part of the building such as may be said to exist in the case of a common stairway or a hall or the roof which is for the protection and use of all tenants. 16 R. C. L. sec. 199. It is conceded, however, that the course of dealings between the landlord and the tenant was such as to show that their construction of the lease was that the basement wall remained under the landlord's control and he seems to have taken it for granted that it was his duty to remedy such defects in the wall as were called to his attention by the tenant. This course of conduct on the part of the landlord could hardly be said to be consistent with any intention on his part that the tenant should be deprived of the beneficial enjoyment of the premises leased.

But, assuming that the conditions complained of involved a portion of the building remaining under the landlord's control which he was under obligation to repair if necessary, the mere fact that the tenant's premises become untenable, cannot constitute a constructive eviction, if such condition is not the result

of any wrongful act of commission or omission on the part of the landlord. 16 R. C. L. sec. 171. In the case at bar, we find no evidence in the record showing or tending to show any wrongful act on the part of the landlord, evidencing any intention on his part that the tenant should be deprived of the enjoyment of the demised premises. Certainly the landlord did not refuse to remedy the conditions complained of when his attention was called to them. On the contrary, expressing his regret over the inconvenience to which his tenant was being put, he directed his architects and contractors to remedy the conditions to which his attention had been called. We do not concur in the tenant's contention that the record shows that the landlord specified that the waterproofing was to be done on the inside, nor would we consider that important if such were the evidence, in view of the advice the landlord had from competent sources on that subject. There is no contention that these architects and contractors were incompetent, although the tenant does contend that the best judgment called for a treatment of this wall other than that which they gave it.

Having engaged competent architects and contractors to remedy the conditions complained of within a reasonable time after the conditions were brought to his attention, even though the work they did failed to accomplish the desired results immediately, it could not be successfully contended that there was constructive eviction, whatever other rights the tenant may have had in the premises, for the conditions in question were in no way the result of any wrongful act of omission on the landlord's part. Rather than indicating any intention on his part that the tenant should be deprived of the continued enjoyment of the demised premises, the landlord's acts, as shown by this record, indicated quite the contrary.

In the case of *Dennick v. Ekdahl*, 102 Ill. App. 199, a situation somewhat similar to the one involved here was presented. That case was an action to recover

rent. The defendant claimed a constructive eviction. The premises involved were leased for a tailor shop. During the winter the trap of a pipe in the basement of the building froze and burst. This pipe led to a washbasin in the leased premises. Under the lease the landlord was not obligated to make repairs. Nevertheless, when the tenant notified him of the bursting of the trap and requested him to have it fixed, the landlord sent a plumber to the premises for the purpose, which was the fourth time the plumber had been there on the same errand and on each occasion he had put in a new trap. The basement was unoccupied and without heat. The plumber concluded that if he put in another trap it would freeze and burst, as the others had, so he merely substituted a piece of straight pipe for the trap, although he had not been instructed to remove the trap. It was claimed that after the trap was removed the tenant's premises were filled with sewer gas. In considering that case this court said, "there is no evidence tending to show that the landlord intended to disturb the tenants, deprive them of the enjoyment of the premises or do anything that would cause them to abandon the same." The court pointed out that upon receiving the tenant's complaint, the landlord sent a plumber to the premises giving him no directions as to the manner in which the defect complained of should be remedied. The court goes on to say: "Manifestly, the landlord did not intend to do a wrongful act, or one injurious to the tenants. The plumber, a licensed workman, used his own best judgment. What he did may not have been the best thing to do but he evidently thought it was. * * * While, whether acts constitute an eviction is a mingled question of law and fact, there must be shown an intention of the landlord, manifested by acts, to deprive the tenant of the beneficial use of the premises,—in brief, a violation of the landlord's contract of enjoyment, to warrant a finding of eviction by a jury. Such there was not in this case."

In *Risser v. O'Connell*, 172 Ill. App. 64, the landlord sued to recover rent and in defense the defendant claimed a constructive eviction. There was a judgment for the defendant and on writ of error to this court it was pointed out that it had repeatedly been held that in order to constitute a constructive eviction, the acts of the landlord must clearly indicate an intention on his part that the tenant shall no longer have the beneficial enjoyment of the premises, and such acts must be of a grave and permanent character, which in their nature deprive the tenant of the beneficial enjoyment of the premises. It was held that there was no evidence in the record showing any such permanent condition but rather the contrary and the judgment was reversed with a finding of fact.

The evidence in the case at bar shows that the condition of which the tenant complained was a temporary one. It was entirely remedied just after the tenant left the premises. The evidence to that effect was admissible on the question of whether the condition complained of was a permanent one.

While the question of whether the landlord's acts or omissions do or do not amount to an eviction must be left to the jury, if the character of those acts or omissions is ambiguous, it is not error to instruct the jury to find the issues for the landlord where there is no evidence in the record showing or tending to show any intention on the part of the landlord to interfere with the tenant's possession.

In our opinion the evidence in this record as to the landlord's actions involves no ambiguity. Not only is there no evidence showing or tending to show any wrongful act or omission of duty on the part of the landlord showing any intention on his part that the tenant's possession or enjoyment of the premises should be interfered with, but such evidence as there is on this point is to the contrary.

For the reasons stated we are of the opinion that the court did not err in instructing the jury to find the

issues for the plaintiff and therefore the judgment of the Circuit Court is affirmed.

*Affirmed.*