### DeForrest Seacord, Appellee, v. Fred Seacord, Appellant.

### Gen. No. 5435.

1. Contracts—*when evidence does not tend to vary.* If the ownership of stock is transferred pursuant to a written instrument, evidence which establishes that a larger consideration was to be paid therefor than that recited and that such larger consideration was not paid as promised, is not incompetent as tending to vary a written instrument.

2. Interest—*how computation to be made by court.* It is in harmony with the spirit of the statute on interest that the court compute interest from the date where the master rested his computation.

Bill for accounting. Appeal from the Circuit Court of Knox county; the Hon. R. J. Grier, Judge, presiding. Heard in this court at the October term, 1910. Affirmed. Opinion filed March 16, 1911. *Certiorari* denied by Supreme Court (making opinion final).

Hardy, Welsh & Hardy, for appellant.

J. D. WELSH, ALVA GREEN and F. F. COOKE, for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

For many years the Galesburg Electric Motor and Power Company operated street car lines in Galesburg. Its capital stock actually issued consisted of 2100 shares, of the par value of $100 each, so that the ownership of 1051 shares would give control of the corporation. Wilkins Seacord was an owner of capital stock therein, and was at one time president of the company. On July 9, 1894, Wilkins gave to his son Fred Seacord 150 shares of said capital stock and to his son DeForrest Seacord 150 shares. The latter is usually called Judd Seacord in this record. The gift to DeForrest Seacord was evidenced by 15 certificates of 10 shares each, which Wilkins Seacord caused to be issued to him on that day in place of certificates running to himself which he that day surrendered. On July 13, 1894, DeForrest Seacord borrowed $3,250 from the Farmer's National Bank of Knoxville and gave his note therefor, payable on demand with interest at six per cent and he deposited with said bank said 15 certificates of 10 shares each of said capital stock as collateral security for said note. In March, 1899, Wilkins Seacord desired to use said certificates of capital stock as security for a larger loan which he was making. By agreement between Wilkins and his son DeForrest, Wilkins paid said note on March 4, 1899, and at or about that date took possession of said shares of stock, and caused them to be placed in his own name. During the time covered by the more important of the transactions involved in this suit, the officers of the company were Fred Seacord, president, Robert Chappell, vice president, Loren Stevens, secretary and treasurer, and DeForrest Seacord, superintendent. On August 23, 1899, Robert G. Chappell, Fred Seacord, Parley M. Johnson and Wilkins Sea-

cord entered into a pooling agreement under which each of said four parties assigned to John C. Vivion, trustee, 280 shares of said capital stock, being 1120 shares in all and being a clear majority of the capital stock actually issued. The trustee was authorized to vote all such shares at all elections and to collect and distribute the dividends; and the owners agreed not to withdraw or transfer their stock without the written consent of all parties to the agreement. Wilkins Seacord died July 3, 1900. Prior to his death certain events hereinafter discussed occurred, as a culmination of which, in his bedroom in his home, the following paper was executed by DeForrest Seacord and delivered there to Fred Seacord.

"GALESBURG, ILL. May 26, 1900.

In consideration of the sum of Six Thousand Dollars to me in hand paid by Fred Seacord, the receipt whereof is hereby acknowledged, I hereby sell, assign and transfer to said Fred Seacord, all my claim, right, title and interest in and to One Hundred and Fifty (150) shares of the Capital stock of the Galesburg Electric Motor & Power Company, formerly standing in my name on the books of said company.

(Signed)    D. F. SEACORD.

Witness:

FANNY M. SEACORD."

The $6,000 named in said document was embodied in a note for that sum of that date, executed by Fred Seacord payable to the order of DeForrest Seacord and payable July 1, 1900, which was then delivered to DeForrest Seacord and was paid on September 29, 1900. Thereafter a fifty per cent bond dividend was declared by the company and issued to the stockholders, and the bonds were sold at par, and still later a dividend of five per cent was declared and paid; and afterwards, on April 7, 1903, Fred Seacord, who had obtained control of the stock included in the pooling agreement and other stock, sold 1235 shares thereof to W. B. McKinley of Champaign, for the purposes of

what is known as the McKinley Syndicate, and received a large sum of money therefor. DeForrest Seacord claimed that before he would sign the paper above set out, dated May 26, 1900, and as one of the considerations which induced him to sign it, Fred Seacord agreed to pay him all that he received upon said 150 shares of stock above said sum of $6,000. Fred Seacord denied that there was any such agreement. It seems that an action at law between DeForrest Seacord and Fred Seacord was tried in the Circuit Court of Knox county in 1906 which concerned said controversy. The abstract before us does not show what became of that suit. On May 24, 1907, DeForrest Seacord filed a bill against Fred Seacord for an accounting of the proceeds and avails of said 150 shares of capital stock formerly owned by DeForrest Seacord and assigned to Fred Seacord by the written instrument above set out. Fred Seacord filed an answer, denying seriatim nearly every allegation in the bill except that Wilkins Seacord was his father and DeForrest Seacord his brother. On November 25, 1908, DeForrest Seacord filed an amended bill for an accounting, and on December 3, 1908, Fred Seacord refiled his answer thereto. Thereafter three issues of fact were made up and submitted to a jury, the third of which was whether there was such an agreement by Fred Seacord to pay to DeForrest Seacord all that he received on said stock over and above the amount originally paid. There was a trial before a jury in 1909 and a verdict in favor of complainant on each issue. Thereafter Fred Seacord moved to set aside the verdict and to dismiss the bill, and afterwards moved for leave to introduce further evidence. Thereupon the court referred the cause to a special master in chancery to take additional evidence on behalf of each party. The special master took and reported additional evidence. Thereafter the court denied the motion to set aside the verdict and dismiss the bill, and again referred the cause to said special master

with directions to state an account between the parties and to report the account and the testimony, and in such accounting to charge Fred Seacord with what he realized from said capital stock purchased from DeForrest Seacord, and to credit Fred Seacord with whatever he paid Wilkins Seacord on said stock, with interest, and with the $6,000 paid DeForrest Seacord, and that Fred Seacord be charged with interest on the balance, if any, due from him from the time he received the money he should have paid over to DeForrest Seacord. The special master made a report and stated the account favorably to DeForrest Seacord. Each party filed objections to various parts of the account, which the master overruled and which were renewed as exceptions before the Circuit Court. The court sustained some exceptions and overruled others and restated the account accordingly, and on June 17, 1910, entered a decree in favor of DeForrest Seacord against Fred Seacord on said accounting for $12,049.17, with interest thereon at five per cent per annum from February 15, 1910, the date to which the master computed the interest. This is an appeal by Fred Seacord from that decree.

Appellant contends that no proof can be heard to show that the agreement of May 26, 1900, was in any wise different from that set forth in the writing of that date executed by appellee; that if oral evidence could be heard to prove a different contract, the evidence in this record is not sufficiently clear and convincing to justify any decree against appellant; and that if appellant is subject to account for what he received upon said capital stock described in said writing, the account has been incorrectly stated against him, and that the net result should have been very much less. Appellant argues with much ingenuity that the evidence introduced by appellee, if admitted and believed, would establish an entirely different contract from that embodied in the writing, and would

make him a trustee only of said stock, and that therefore this extraneous evidence is not receivable. We conclude that the effect of said evidence is only to show that appellant agreed to pay a larger consideration than that stated in the writing. By that writing the stock was absolutely transferred from appellee to appellant beyond recall. It is evident that those acting under the pooling agreement desired control of a majority of the stock not only to keep control of the corporation and of its officers, but also in the expectation and hope that they would be able to sell the entire property at a profit. The only force of the evidence offered by appellee is to show that appellant not only agreed to pay appellee $6,000 or forty per cent of the par value of the stock, but also represented to appellee, who was unwilling to sell, that he did not wish this stock for the purpose of making any profit upon it, but only to aid him in retaining control of the corporation, and that he would also pay to appellee all that he might receive or make upon said shares of stock over and above said sum of $6,000. The recital in an instrument of the consideration therefor is *prima facie* only, and is not conclusive, and it can be explained, varied and contradicted by parol proof, unless the effect of such proof would be to defeat the grant, transfer or contract, made by such instrument, and thus make the instrument void. This principle has been recognized, discussed and applied in many cases in this state, in some of which the reasoning is very pertinent here. Kinzie v. Penrose, 2 Scam. 516; Sidders v. Riley, 22 Ill. 110; Kimball v. Walker, 30 Ill. 482; Ill. Cent. Ins. Co. v. Wolf, 37 Ill. 355; Elder v. Hood, 38 Ill. 533; O'Brien v. Palmer, 49 Ill. 72; Jones v. Buffum, 50 Ill. 277; Booth v. Hynes, 54 Ill. 363; Primm v. Legg, 67 Ill. 500; Huebsch v. Scheel, 81 Ill. 281; Morris v. Tillson, 81 Ill. 607; Drury v. Holden, 121 Ill. 130; Howell v. Moores, 127 Ill. 67; Union Mutual Life Ins. Co. v. Kirchoff, 133 Ill. 368; Worrell v. Forsyth, 141 Ill. 22; Koch v. Roth, 150 Ill. 212; Ster-

ricker v. McBride, 157 Ill. 70; Lloyd v. Sandusky, 203 Ill. 621; Brosseau v. Lowy, 209 Ill. 405; Merriman v. Schmitt, 211 Ill. 263; Gage v. Cameron, 212 Ill. 146; Stannard v. A. E. & C. Ry. Co., 220 Ill. 469; Redmond v. Cass, 226 Ill. 120; Poe v. Ulrey, 233 Ill. 56; Spence v. Central Accident Ins. Co., 236 Ill. 444; Russell v. Robbins, 247 Ill. 510. We are of opinion that it was competent to show that the actual consideration agreed to be paid by appellant to appellee was greater than that expressed in the writing; and that if that fact is established appellant, the purchaser of the shares of stock, may be required in equity to pay the larger consideration.

Appellee testified that shortly before the day when the written agreement above set out was given there was a meeting in the directors' room of the First National Bank at which his father was present and his brother and himself and Loren Stevens and Fletcher Carney, who was his father's attorney. Appellee testified that his brother, the appellant, notified him that his father was going to dispose of some of his personal property and wanted him to come there; that at that meeting appellee was handed a package of papers with a rubber around it, as his part of the division his father was then making of his personal property; that appellee did not open the package until he reached home, when he found that the principal thing in it was the note for $3,250 of date July 13, 1894, which his father had taken up for him at the Knoxville Bank, as already stated. He also found that his certificates of shares of stock in the company were not in the package. He met appellant that afternoon and asked appellant where his stock was, and was told by his brother that he had never had any stock. The evidence indicates that appellee understood that each son was to receive about $4,000 worth of property in that division that day, and, if that was Wilkins Seacord's intention, it was not carried out by giving appellee

that cancelled note and retaining his stock, which was worth much more than the note. If the father retained the stock, which had been collateral to the note, then appellee had not only paid the note in full but his father owed him a considerable sum in addition. Appellee became uneasy and felt that he was being overreached in some way. He went to Carney early the next morning. According to the evidence of Mrs. Fanny M. Seacord, wife of Wilkins Seacord and stepmother of appellant and appellee, appellant in some way learned of appellee's dissatisfaction and came to see his father about noon of that day, which was May 26, 1900, and had a private interview with him, and then told Mrs. Seacord that there were some business matters of the street car company going on, and to go to his father, which she did. Wilkins Seacord then told her to get Carney and Loren Stevens and bring them to the house after dinner. Appellee's wife was at the house and talked with Wilkins Seacord and then went for her husband. Appellant and appellee and Stevens and Carney and Mrs. Wilkins Seacord met in the afternoon with Wilkins Seacord in the bedroom of the latter. Appellee testified that his father was in a very feeble condition; that appellant then told appellee that he wanted to buy his 150 shares of stock, and that their father was desirous that appellant should use it; that appellee said he did not wish to sell it, and that his father had told him to keep it and not to sell it; that appellant asked him what he would take for it and what it was worth, and that he declined to sell; that Stevens then left and said he would have nothing more to do with it as there was going to be trouble; that he left with Stevens and went out doors and went to the steps of his own house, but his brother called him back and he went back, and that appellant then told him that he did not want to make anything out of him, but that he just wanted to control that stock, and that it would bring more if he could control it than ap-

pellee could get out of it, and that their father wanted appellant to have it; that after much discussion appellant said that if appellee would assign the stock to him then at forty cents, he would give appellee all he got out of it, as he did not want to make anything out of him, but only to control the stock, and appellee thereupon agreed to assign it upon those conditions; that Carney then told him to sign a paper which had been previously prepared, and he did so without reading it, and that he did not know whether Carney did or did not read it in his presence. Appellant then asked appellee if he would take appellant's note for the $6,000 and appellee agreed to do so. Appellee testified that he met his brother again the next morning in front of the First National Bank; that his brother then told him that he did not want to make anything out of appellee, and that he would do as he had agreed, and would pay appellee all that he got out of the stock; that along in August he again met his brother on Monmouth boulevard, where appellee was finishing up an extension of a street car line, and that appellant, in the presence of Andrew Erickson, told appellee that he would do as he agreed and would pay appellee dollar for dollar for what he got out of the stock; that he had several other similar conversations thereafter with appellant, in one of which reference was made to a suit which their step-mother had brought or was about to bring, concerning the estate, and appellant told appellee to keep his fingers out of it and appellant would take care of appellee and do as he had agreed; that in the spring of 1903, after the sale to the McKinley Syndicate, appellee went to see appellant at the Brown farm, which appellant had just bought, and appellee asked appellant for money. Appellant replied that he had put $19,000 into that farm and he could not pay appellee then; that the McKinley people still owed him $12,500 and as soon as he got that he would pay appellee. Appellee testified that on another occasion

Seacord v. Seacord, 160 Ill. App. 328.

he went to appellant for money and met him in the directors' room of the First National Bank, and that appellant told him that he did not have the ready money; that he did not know whether he would ever pay appellee directly, but that he would see that his family got the benefit of it. Mrs. Fannie M. Seacord, the widow of Wilkins Seacord, testified to the meeting on May 26, 1900, in her husband's bedroom in the presence of her husband, appellant, appellee, Stevens and Carney; that in the conversation which followed appellant wanted appellee to assign some street car stock to him for forty cents, and told appellee that when he disposed of the stock he would give appellee all he got for it over forty cents; that appellee said he did not want to dispose of it; that appellant said that the reason why he wanted the stock was that he wanted control of it temporarily and he did not wish to make anything out of it. Andrew Erickson testified that on the occasion of the interview between appellant and appellee on Monmouth boulevard appellant told appellee "When I sell the road I will pay you dollar for dollar." Loren Stevens testified that the reason why he was called to attend the meeting in the home of Wilkins Seacord on May 26, 1900, was because Wilkins Seacord was very old and feeble, and all his heirs had asked Stevens to act as administrator of the estate when Wilkins Seacord died, and it was desired that he be present and be familiar with the transactions of that day; that there were 150 shares of stock in controversy; that appellant said he wanted it as he desired to control a majority of the stock, and he proposed to buy it of appellee and have appellee transfer the stock to him, and asked that the father name the consideration for the transfer, and that whatever sum the father fixed would be acceptable to appellant; that appellee appeared to be unwilling to transfer the stock and to be dissatisfied with the price named; that when the witness saw there was likely to

be a disagreement in the management of the estate he told those present that he would not serve as administrator and he then left. Robert G. Chappell testified that he had been a stockholder and a director in the company from its organization till 1903, and at one time had been president; that appellant at various times told him that he was desirous of securing control of the stock which appellee had, as he was afraid that appellee would sell or dispose of it; that after the death of Wilkins Seacord he had a conversation with appellant about appellee's matters, in which appellant told him that whatever he got out of this stock he expected to put in such shape that appellee's family would receive the benefit of it. Several witnesses testified that at the time of this transaction this stock was worth one hundred cents on the dollar, which would be $15,000. One witness wavered between seventy-five cents and one hundred cents. No other witness placed the value lower than one hundred cents on the dollar at that time.

Appellant testified in his own behalf that he bought these 150 shares of stock, which appellee had formerly owned, from his father and paid for it by his note, and put it up with his father as collateral for that note, and put in evidence what he testified was his father's receipt for said stock as collateral for said note. Appellant testified that he was not present at the meeting in the First National Bank on the afternoon before May 26, 1900, nor at any meeting when a bundle of papers or a note was delivered to appellee; that he was not present at his father's house on May 26, 1900, before the afternoon meeting in his father's bedroom; that at the afternoon meeting there his father said he had been dividing up some of his personal property and that appellee was complaining and thought he should have been allowed more because the street car stock he had sold his father had increased in value and he should have received more out of it when he sold it; that their father asked appellant if he would feel

like allowing appellee any more on it; that appellant
replied that he would be satisfied with whatever his
father might say that he should do, and that their
father, after a long study, asked appellant if he would
pay appellee $6,000 more and appellant replied that
anything his father said would be satisfactory to him;
that Stevens left after that, and appellee argued with
them a while and went away and came back, and Car-
ney then wrote out the paper above set out and appel-
lee signed it and agreed to take appellant's note for
$6,000 and Carney drew the note and appellant signed
it.   Appellant testified that the paper was read over
to appellee just before he signed it, and that appellee
took it and looked it over closely.   Appellant denied
that he notified appellee to come to the bank the day
before, denied the conversation testified to by appel-
lee as having occurred in the afternoon after the meet-
ing in the bank, denied the conversation on Monmouth
boulevard, and denied each of the other conversations
to which appellee testified.   Appellant testified that he
bought this stock from his father in good faith and
paid him for it; that at the meeting on May 26, 1900,
appellee was not claiming that he owned this stock, but
claimed that he was not getting enough out of his
father's personal property; that appellee was not mak-
ing any claim to any stock, but wanted an amount of
money.   Carney testified that he was present in the
directors' room of the bank when Wilkins Seacord di-
vided up various notes and accounts between appel-
lant and appellee; that the next morning appellee came
to his house and claimed that he was not getting enough
in the division; that his father had included a note
that had been paid; that he had turned back this stock
to his father, and thereby had really paid the note,
and therefore he thought he ought to have something
additional beyond the $4,000; that he was present at
the home of Wilkins Seacord in the afternoon of May
26, 1900, with Wilkins Seacord and wife, Stevens, ap-

pellant and appellee; that Wilkins Seacord said that
appellee was dissatisfied with the amount he had given
him and claimed he should have more, and that he had
got the parties there so that matters could be fixed so
that there would be no question or trouble about it
after his death; and most of the talking was done by
appellee and his father; that appellee claimed that he
did not get enough to make him even with what his
father had done for appellant; that this stock which
his father had disposed of to appellant had increased
in value and thereby appellant was getting more than
the $4,000 given appellee in notes and obligations that
his father held against him or had paid to him; that
his father ought to give him more money and he wanted
some of the street car stock; that Wilkins Seacord re-
plied that he had disposed of that to appellant; that
appellant said if there was any arrangement that his
father wanted to change it would be satisfactory to
him; that Wilkins Seacord had his pencil and some
papers and figured for a long time; that Stevens and
appellee each left; that appellee came back and then
Wilkins Seacord asked if it would be satisfactory to
both if appellant were to pay appellee $6,000 as an
additional sum to satisfy appellee for any claim he
had on account of street car stock he had turned back
to his father and his father had disposed of to appel-
lant; that they both acceded to that; that the witness
then drew up the paper at the request of Wilkins Sea-
cord and read it to all of them and had it signed by
appellee; that appellant asked appellee if he would
take his note for a short time, and appellee agreed,
and the witness drew the note, and appellant signed
it and delivered it to appellee. Carney testified that
there was no statement made there by any of the par-
ties that appellee was to have forty cents on the dol-
lar for the street car stock and afterwards receive any
sum in addition thereto when the stock should be dis-
posed of, and that there was no talk of any additional
payment. It will be seen therefore that the case for

the appellee rests upon the testimony of appellee, Mrs. Fanny M. Seacord, Andrew Erickson, and Robert G. Chappell, and the case for appellant upon the testimony of himself and Fletcher Carney; and that the testimony of Loren Stevens, who left the room before any agreement was reached, supports appellee on some points and appellant on others.

The testimony of appellant is much impaired by the necessity he found of retracting a considerable portion of his most important evidence. Appellant testified that he purchased from his father on January 28, 1899, the 150 shares of stock here in question, which appellee had formerly owned, and paid for it by a note to Wilkins Seacord which he then offered in evidence, and which was a note for $3,180, dated January 28, 1899, payable on demand to the order of Wilkins Seacord, with interest at six per cent, signed by appellant; that on that day at the First National Bank of Galesburg his father delivered to him the certificates for these 150 shares of stock; that appellee's name was then on the face of the stock and appellee's name was written on the back; that he then surrendered these certificates on that day and had certificate 215 issued to himself for said 150 shares, and delivered that certificate to his father as collateral to that note for $3,180 and took from his father a receipt for said certificate 215 representing the 150 shares of stock in which appellee's name had appeared; and he offered said receipt in evidence, and it was a receipt by Wilkins Seacord dated January 28, 1899, acknowledging the receipt from appellant of certificate 215 for 150 shares of stock of this company to be held as collateral to a note of that date for $3,180. This testimony was given by appellant at the trial of the issues by the jury, and it was as positive as any testimony that he gave at any time, and seemed to be thoroughly fortified by documents. At the time of that trial the books of the company had been removed from Galesburg by the

McKinley Syndicate and could not then be found. Upon the first reference to the master the stock book of the company was obtained, and it then turned out that this testimony by appellant was entirely incorrect in every particular, so far as pertains to the stock at issue in this case. In fact, on January 28, 1899, appellee's stock was on deposit in the Farmer's National Bank at Knoxville as collateral to appellee's note for $3,250 to that bank. The 150 shares of stock which appellant owned and surrendered and caused to be put into certificate 215 was not bought by him from his father at all, but was bought from Parley M. Johnson, Robert G. Chappell and Albert Johnson for the sum of $3,000 and said stock was not bought on January 28, 1899, but on January 24, 1898, and the note which he gave his father on January 28, 1899, for $3,180 was not given for the purchase money of stock which had ever been owned by appellee. The fact was that on January 24, 1898, appellant borrowed $3,000 from his father with which he paid Parley M. Johnson et al., for the stock he then purchased. At the end of the year when the note for $3,000 was due from appellant to his father, he then gave his father a new note dated January 28, 1899, for the principal and interest of that debt in the sum of $3,180 and then delivered to his father as collateral said certificate 215 for 150 shares which had been issued to appellant on January 24, 1898, upon the surrender of the certificates which he purchased from Johnson et al. When this stock book appeared in evidence appellant again took the stand and admitted the entire incorrectness of all his former testimony on this subject. Appellant was also otherwise contradicted. While he testified at the trial before this jury that he saw all these certificates of stock which appellee had formerly owned and saw that they were each made out to appellee on their face and bore appellee's signature on the back, it was proven by the official stenographer that at the trial of the law case

above referred to in 1906, appellant testified that when he bought appellee's stock from his father appellant did not have the certificates of stock in his hands and they were not turned over to him, and all that he had by which to know that the stock which he bought of his father was the stock which appellee had actually owned was his father's word, and that he was not sure that it was appellee's stock. It also appeared that on the trial of that law case, he testified that the conversation at his father's home on May 26, 1900, was concerning the sale by appellee to appellant of appellee's stock at forty cents on the dollar and that appellee finally accepted forty cents on the dollar. It is obvious that the faith of the jury and the master and the chancellor in the recollection of appellant of conversations and transactions occurring ten and more years before he testified must have been much impaired by these mistakes made by appellant. The testimony of Carney fully supports appellant's claim that he did not make the verbal agreement here relied upon by appellee, but it is to be remembered that this was a matter of no personal importance to Carney, that such conversations about his clients' business affairs were probably a matter of daily occurrence in his practice, that he testified nearly ten years after the conversation in question and that his memory would be refreshed by the paper which he then prepared and he might easily fail to remember a conversation not included in that paper and might readily reason that if there had been such a conversation he would have included it in the paper. Not only are there four witnesses for appellee and but two for appellant, of whom one is appellant, who is badly hampered by his own mistakes upon the witness stand, but there are two other facts not contradicted. One is that this stock was worth $15,000 when appellant paid appellee $6,000 for it. It is clear from all the testimony that Wilkins Seacord was anxious to have appellant control this stock. This may have been because he knew of the im-

portance of the majority of the stock being held under the pooling agreement, so that they could sell the property in bulk for a good price, or it may have been because he was afraid that appellee would sell it to the owners of the minority stock. It is clear from all the evidence that appellee was very unwilling to sell, and that he refused to do so and left the house and then came back again. It is unreasonable to believe that he would have sold $15,000 worth of stock for his brother's note for $6,000. If, however, he was assured, as he claims, that the stock would be worth more in his brother's hands than it would in his, and that he should be paid all that the stock brought above $6,000 then his act in selling that stock as he did is much more reasonable. Another important and almost controlling consideration is this: Chappell is a business man, had been director of the company from its organization to its sale to McKinley, had been president of the company, and had known appellant and appellee since they were boys. Appellant does not deny Chappell's testimony that appellant told him that he wanted to secure control of appellee's stock for fear that appellee would sell it, and that after the death of Wilkins Seacord, appellant told him in a conversation about appellee's affairs that whatever he, appellant, got out of this stock he expected to put it in such shape that appellee's family would receive the benefit of it. If appellant bought this stock of his father in good faith at any time, and paid his father in full thereafter, and afterwards paid his brother $6,000 more to satisfy his brother that he was getting a fair share of his father's estate, and if the brothers felt hostile to each other in regard to this business, as all the proof showed that they did, it is very improbable that appellant would afterwards plan to give to his brother's family all the profit on this stock. If, however, he had promised his brother to give him this profit, he might very readily feel at liberty to put that

profit in such a shape that it would be available to his brother's family. The chancellor saw the witnesses at the trial of the issues by the jury and heard their testimony, and can better judge where the truth lay than we can.

There is some confusion as to when Wilkins Seacord became possessed of appellee's 150 shares of stock. As already stated, it was on deposit with appellee's note at the Farmer's National Bank at Knoxville. That note was paid on March 4, 1899. At some prior date Wilkins Seacord applied to appellee to loan him this stock that he might use it as collateral for a loan of $22,000 which he wished to secure for appellant in Chicago, and appellee consented to so loan his stock. But he did not know what use his father made of the stock, nor whether he used it to borrow money in Chicago or not. The stock book of the company shows that on February 15, 1899, said shares were surrendered to the company and in lieu thereof certificate 222 for 150 shares was issued to Wilkins Seacord. Whether the Knoxville bank permitted the original fifteen certificates to be taken to Galesburg, where the stock book was kept, and there to be changed into one certificate for 150 shares to be issued to Wilkins Seacord and returned to it, or whether the stock book was taken to Knoxville and the change in the form of the certificates made there, the record does not disclose; and objections were sustained to questions which might have revealed the fact. Appellee testified that his father got the stock when he paid appellee's note at the Knoxville bank, but that was only a surmise on his part as he was not there and never saw his certificates after he had delivered them to the Knoxville bank when the loan was made. An officer of the Knoxville bank testified that the stock remained in his bank after appellee's note was paid, so that it may be that Wilkins Seacord secured at the Knoxville bank the loan for which he wished to use appellee's stock. In

any event, the pooling agreement of August 23, 1899, was made after Wilkins Seacord had put into his own name the certificates for appellee's stock. It is evident that appellee's 150 shares were a part of the stock which Wilkins Seacord at that time put into the pooling agreement, for Wilkins Seacord transferred this 150 shares of stock in certificate 222 to appellant on May·9, 1900, and on May 7, 1900, the members of the pooling agreement entered into a supplemental contract permitting Wilkins Seacord to transfer his stock to Fred Seacord. It is clear that appellee did not consent that his stock be put into the pool, and did not know that that had been done. It is obvious that appellant feared that appellee would compel the re-delivery of his stock to him. If that had been done it would have reduced the shares in the pool to 970 or 81 shares less than a majority. The chancellor might reasonably infer from all this proof that when appellant learned that appellee was inquiring after his stock on May 25 and 26, 1900, and appeared to feel that he had been overreached, appellant was much disturbed for fear that the pool would be deprived of its hold upon the corporation. If he had a private interview with his father about noon on May 26, 1900, as his step-mother testified, it is reasonable to believe that the matter there discussed was the danger that appellee would be able to take his stock out of the pool; and that some arrangement was then made between his father and appellant as to how far they would go to get appellee to sell his stock; and that appellant's willingness at the meeting that afternoon to pay whatever price his father might fix was because he had a previous understanding with his father on that subject. The control of the street car company had been valuable to the Seacord family. Wilkins Seacord had been president, appellant was now president, appellee had long been superintendent, and it is evident that both appellant and Wilkins Seacord were anxious to have this control continued and thereby be in a posi-

tion to make an advantageous sale of the whole property. The evidence justifies the conclusion that appellant was much more thrifty and a better financier than appellee. It also shows that appellee could have sold his stock to some of the minority stockholders. All this leads to the reasonable conclusion that if appellee would not accept $6,000 for the absolute transfer of his stock, appellant would not be unwilling to give him all the profit that might afterwards be derived therefrom. We are of opinion that the court properly required appellant to account to appellee for the profit on this stock.

The court directed that in the accounting appellant be allowed for the amount he paid his father for this stock. No cross errors are assigned, and that ruling is unquestioned. Appellant contends that he paid his father $3,382.35 for this stock, and that the court erred in crediting him with only $1,812 therefor. Appellant finally testified he bought this stock on May 9, 1900, from his father. On May 10, 1900, his father surrendered certificate 222 containing appellee's 150 shares, and appellant took out certificate 218 for 280 shares, registered as transferred to appellant by Wilkins Seacord, and which included this 150 shares of which appellee was the real owner. The stock book stub to certificates 228 issued to appellant May 10, 1900, shows that this stock was all transferred to appellant by Wilkins Seacord from 14 certificates, the separate numbers of which were not given on the stub. An examination however of the proof as to the contents of the stubs in the stock books shows what the number of the certificates were. One was certificate No. 222 for the 150 shares owned by appellee. The other certificates were Nos. 58, 59, 60, 61, 62, 63, 65, 67, 68, 69, 70, 71 and 72, being 13 certificates for 10 shares each, or 130 in all, each of which was assigned by Wilkins Seacord to appellant on May 9, 1900, and cancelled on May 10, 1900. On June 2, 1900, appellant

paid his father $3,382.35 by check which he testified was for this stock. Sometimes he testified he paid that for the stock which had been appellee's, and his testimony is in some places apparently that he paid that check for the 280 shares. He was pressed to state what he paid for the other 130 shares, and did not remember and could not state. He was urged to examine his books and papers and to return to the stand and show what, if anything, he paid for the 280 shares other than this check for $3,382.35. He failed to furnish any such information. This appears more fully in the record than in the abstract. He testified that his father did not give him any of these 280 shares. Appellee put in evidence the bank accounts of both appellant and his father from May 1, 1900, to the death of Wilkins Seacord, and they did not show any large check from appellant to his father other than that for $3,382.35. We are of opinion that the court did not err in concluding that he paid that check for the 280 shares which would be $1,812 for the 150 shares owned by appellee.

The contract by which appellant sold to McKinley first provided that appellant agreed to sell a certain property known as Highland Park, and the personal property connected therewith, and a certain lease from the C. B. & Q. Ry. Co. of certain lake privileges, for $15,000; then that he agreed to sell McKinley 1235 shares of this street railway stock for $50 per share, and that McKinley should issue to appellant 500 full paid shares of the par value of $100 each of the capital stock of a new company which McKinley was to organize "to take over this and perhaps other property," and that McKinley would pay appellant $12,500 in cash for said stock if appellant tendered the same to McKinley during April, 1904. The contract then provided that $10,000 should be paid to appellant at once and $66,750 about April 15, 1903, and that appellant should then deliver to McKinley a warranty

deed for Highland Park, an assignment of the C. B & Q. lease, and said 1235 shares of stock. McKinley did not pay said $12,500 and appellant sued him therefor and had judgment for that amount with interest and collected the same. The court, in this case, decreed to appellee, as a part of the purchase price of the street railway stock his *pro rata* share of the sum appellant so recovered from McKinley. Appellant testified that these 500 shares of stock in a new company, or $12,500 in money, was not any part of the purchase price of this street railway stock, but that it was for the Galesburg & Monmouth Rapid Transit Company, which had a franchise for an interurban road, and which he also sold to McKinley, and in which the street railway company had no interest. Chappell was interested in the street railway company stock sold by appellant to McKinley, and also in the interurban road, but in different proportions. There was in evidence a statement rendered by appellant to Chappell in which he treated this $12,500 and interest as a part of the avails of the sale of the street railway stock, and accounted to Chappell in the proportion which Chappell's street railway stock bore to all the street railway stock which appellant sold McKinley. Chappell gave testimony supporting appellee's claim that this was a part of the purchase price paid by McKinley for the street railway stock. There was proof of testimony given by appellant at the trial of the law case tending to the same conclusion. When appellant's testimony, the McKinley contract, the statement to Chappell, and the testimony of Chappell, are all considered, we hold the court was warranted in concluding that this was a part of the consideration for the street railway stock.

The master computed interest to February 15, 1910. After various objections thereto had been considered and overruled, the master filed his report in court March 18, 1910. The final decree was entered June 17, 1910, and while the court sustained exceptions to

the report and modified it, it still carried the computation of interest only to February 15, 1910. It awarded $12,049.17 as due appellee on February 15, 1910, and ordered execution for $12,049.17 with interest thereon at five per cent per annum from February 15, 1910. Appellant argues that is compelling him to pay usury. Section 3 of the statute relating to interest would have authorized the court to compute interest at five per cent per annum from the date of making the report to the time of entering the decree, and this would have been interest upon the interest items in the report. The court pursued a course more favorable to appellant. It found the amount due on the date to which the master computed the interest and did not add interest on interest to the date of the decree in June. The report was not actually dated or filed on February 15, and it is obvious that in stating a complicated account, some time must be allowed the master after he has computed the interest in which to draw his report, and to counsel some time in which to prepare and submit objections, and some time to the master to consider and decide such objections. We think it in harmony with the spirit of the statute that the court compute interest from the date where the master rested his computations.

We have considered the other objections to the accounting and think them not well founded. A careful consideration of the record convinces us that substantial justice has been done between appellant and appellee.

The decree is therefore affirmed.

*Affirmed.*

THOMPSON, J., took no part.