## F. P. Brownholtz, Appellee, v. The Providers Life Assurance Company, Appellant.

### Gen. No. 29,229.

1. CORPORATIONS—*when contract of employment by proposed corporation shown.* A contract of employment made by plaintiff to act as superintendent of an insurance company which was being organized, and signed by him and in the name of the corporation by a certain person as president and "authorized officer" who upon completion of the incorporation, was elected president, was binding on the corporation upon all of the acts of the president during the period of organization being ratified and upon plaintiff entering upon the employment in accordance with the agreement, and he could recover thereon for his subsequent wrongful discharge.

2. MASTER AND SERVANT—*when contract of employment valid for mutuality.* A contract of employment between plaintiff and a corporation containing a number of promises on the part of each constituting the consideration is not void for want of mutuality because it was made binding for one year but should become void if plaintiff should leave the service without the company's consent.

3. MASTER AND SERVANT—*insufficiency of grounds for discharge of servant.* Where the service of plaintiff as a superintendent of a district for defendant insurance company was such as to call forth a congratulatory letter from defendant's president a showing of subsequent conduct given as the reasons for plaintiff's discharge less than two months thereafter held not sufficient justification of the discharge to warrant setting aside a decree in favor of plaintiff in his suit for an accounting for salary.

4. MASTER AND SERVANT—*allowance of interest on contract of employment.* Where a contract in writing made before the organization of a corporation for the employment of plaintiff when the corporation was organized was ratified by the directors after organization there was not a written contract upon which interest could be allowed under chapter 74, sec. 2, Cahill's St. 1923, in a suit by the employee for wrongful discharge.

Appeal by defendant from the Circuit Court of Cook county; the Hon. FRANCIS S. WILSON, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1924. Decree modified and affirmed. Opinion filed April 29, 1925. Rehearing denied May 13, 1925.

CHURCH, HAFT & ROBERTSON, for appellant.

HOYNE, O'CONNOR & RUBINKAM and C. H. MC-DERMOTT, for appellee.

MR. JUSTICE TAYLOR delivered the opinion of the court.

On January 8, 1917, the complainant, Brownholtz, and two others, filed a bill of complaint in the circuit court of Cook county, claiming that the defendant, The Providers Life Assurance Company, was indebted to them, and praying for a receiver and an accounting. Later, various amendments were made, as a result of which all the complainants and defendants were eliminated, save Brownholtz as complainant and The Providers Life Assurance Company as defendant. After the issues were joined there was a reference to a master to take proofs and report his conclusions "both of law and fact on the question of the right of the complainant herein to an accounting from said defendant." Subsequently, the master made a report, finding that the complainant was entitled to an accounting. Objections and exceptions to that report were made and overruled, and the cause re-referred to the master to take evidence and state the account. Pursuant thereto, the master made a second report, in which he found that there was due to the complainant from the defendant the sum of $1,578.65. To that report objections and exceptions were made and overruled, and, on October 23, 1923, a decree entered approving and affirming the report, and finding that there was due the complainant from the defendant the principal sum of $1,247.70, together with interest in the sum of $330.95, making a total of $1,578.65, with costs. This appeal is from the latter decree.

It is the theory of the complainant that, while in 1915 The Providers Life Assurance Company was in process of organization, various insurance agents and superintendents, of whom the complainant was

one, were employed; that on December 10, 1915, prior to the finished incorporation of the defendant, a contract, signed, "The Providers Life Assurance Company, M. Spiegel, President, Authorized Officer," was made, and after the completion of the incorporation on February 19, 1916, was ratified and approved by the defendant, and that as a result, owing to the subsequent discharge of the complainant, without cause, the defendant was liable in a certain amount.

On the other hand, it is the theory of the defendant that the contract was never ratified or approved; that it is void for lack of mutuality; that if ever legally consummated, the defendant was justified in discharging the complainant, and, that, in any event, the allowance of interest on the amount of principal found due was error.

Two questions arise, first, what if any contract was made between the complainant and the defendant? and, second, was the defendant justified in discharging the complainant?

Apparently, in the year 1915, certain persons, including one Spiegel, undertook to organize a life insurance company, that company being the defendant, The Providers Life Assurance Company. It was finally organized and its certificate of organization filed for record with the recorder of Cook county on February 19, 1916. Prior to its organization, on December 10, 1915, a document purporting to be a contract between the complainant and the defendant was made out and signed in the name of the defendant company with M. Spiegel as president. Following his name are the words, "Authorized Officer." Following the signature of the company, the complainant signed and above his name recited that he approved and accepted the foregoing agreement, and agreed to be bound by its terms, and to act as superintendent of The Providers Life Assurance Company of Chicago. Of course, at that time, The Pro-

viders Life Assurance Company did not exist as a legal entity. Subsequently, however, immediately after February 19, 1916, the complainant went to work for the newly organized defendant company as superintendent, and took charge of what was called district No. 6. After the organization of the defendant, February 23, 1916, at a meeting of the board of directors, a resolution was passed fully approving ''all and every act of Max Spiegel during the period of the organization of the company.'' Also Spiegel was elected president. The complainant went to work under his contract on February 19, 1916, and worked until June 24, 1916, when he was discharged.

The contract, which was drawn up and signed on December 10, 1915, and which was one of the acts of Spiegel during the period of the organization of the company, and which was approved by the board of directors of the defendant on February 23, 1916, and pursuant to which complainant worked until he was discharged on June 24, 1916, contained a number of provisions, among them the following: That the complainant would act as superintendent of district No. 6 pursuant to the rules of the company; that he would not advertise any business of the company without first receiving the consent of the executive office; that he would devote his full time and energies in soliciting business and instructing agents, and attending to all other business of the district falling within his duties; that the defendant would pay office rent, clerk hire and for all supplies for the district; that he should receive for his services $40 a week, payable weekly. It then provided for an increase in his compensation, dependent upon the way in which the business in district 6 increased. It also provided for a commission upon whatever policies were issued, placed and paid for in his district. It also provided that he should become a stockholder in the defendant for not less than fifteen shares. In

the latter part of the contract appears the following: "To all the foregoing, The Providers Life Assurance Company hereby agrees with you the said F. P. Brownholtz to be binding on you and The Providers Life Assurance Company alike, and cannot be terminated by you or the Company until one year from date of the actual opening of said District Office for the purpose of soliciting and procuring applications for Life Insurance, but * * * should you violate any of the terms of this agreement, then this agreement shall become *ipso facto* null and void." It also provided that the defendant should not be liable for any compensation for the complainant's services "until after the company shall be licensed to transact the business of life insurance."

It is urged, on behalf of the defendant, that as the document in question was signed on December 10, 1915, and the completion of the organization of the defendant took place on February 19, 1916, the so-called contract in question never came into being. There does not seem to be any merit in that contention. The complainant and Spiegel undertook to draw up a document which might be binding after the corporation was fully organized. That is emphasized by the fact that in the next to the last paragraph of the document it is provided that the company should not be liable to the complainant for any services rendered by him until after the company should be licensed to transact the business of life insurance. Obviously, the matter was tentative. Therefore, when the company was organized, and at a meeting of the board of directors on February 23, 1916, at which not only a quorum but practically all the directors were present, a resolution was passed fully approving "all and every act of said Max Spiegel during said period of organization of the company," and complainant went to work immediately after the organization of the company and took charge as super-

intendent of district No. 6, and worked there until June 24, 1916, and meanwhile his work was ratified and sanctioned and the benefits of it received by the defendant, it follows that all the terms of the so-called contract dated December 10, 1915, were adopted by both parties, complainant and defendant, and became mutually binding on both from the date of the complete organization of the defendant, that is, February 19, 1916.

Counsel cite *Gent v. Manufacturers & Merchants' Mut. Ins. Co.*, 107 Ill. 652. That case is not apt. There the plaintiff sued on a so-called contract of fire insurance which had been entered into, and the premium paid, before the defendant insurance company had received its charter. The court held that the company was not bound. Here the suit is upon a contract that came into being after the defendant filed its charter. We do not hold that any contract existed before the defendant was chartered, but that the acts of the directors and the conduct of the plaintiff constituted the making of a contract, the terms of which were set forth in the document which had been prepared and signed before. It was not necessary that it should be rewritten and signed after the charter was issued. Both parties were entitled to adopt the contents of any instrument as constituting the terms of a contract between them. It is no sufficient answer to say that some of the directors did not know of the resolution of adoption or approval. The evidence of the minutes of the meeting is too persuasive. *Streator Independent Tel. Co. v. Continental Tel. Const. Co.*, 217 Ill. 577; *Norris v. Hess Bright Co.*, 185 Ill. App. 262.

The very resolution of February 23, 1916 adopted at the meeting of the board of directors, recited that whereas Spiegel as the promoter and organizer of the company had full charge of the sale of stock and all receipts and disbursements, and that whereas the

board of directors, acting by virtue of its election on February 18, 1916, "has acquired full knowledge of the affairs of the Company as appearing on this day, and has also made careful examination into the affairs and transactions of said Max Spiegel during the period of organization of the Company, it is resolved * * * that this Board of Directors fully approves of all and every act of the said Max Spiegel during the said period of organization." It is a justifiable inference from that that the directors acted with knowledge.

It is claimed on behalf of the defendant that the contract is void for want of mutuality, in that it provides that it shall be binding for one year from the date of the opening of the company's district office; but, on the other hand, should the plaintiff "leave the service of the Company without our consent, * * * then this agreement shall become *ipso facto* null and void."

The contract in question contains a number of promises on the part of each, which mutual promises constitute the consideration, respectively, on each side. The contract enumerates a series of obligations on the part of each. It is a bilateral contract, and there being mutual obligations, it cannot be said to be lacking in mutuality. The fact that the contract provided that it should run for a year and be binding on both, but if the plaintiff left the service of the defendant without its consent, or violated any of the terms of the agreement, then it should become null and void, does not evidence lack of mutuality, as that term is used in the law of contracts. In a contract of employment where there are mutual promises which constitute sufficient consideration to make it a binding contract, either party may bind himself thereby for a definite or indefinite period, which may depend upon his own action or upon that of the other. The principle is well stated in *Carter White Lead*

*Co. v. Kinlin,* 47 Neb. 409.  It is as follows:  "We do not think that a contract lacks mutuality merely because every obligation of the one party is not met by the equivalent counter obligation of the other. If the consideration existed, the company might well bind itself to furnish the plaintiff employment for a definite period, or an indefinite period, not depending on its own acts, and at the same time give the plaintiff the option of releasing it from obligation by an earlier termination, if he so desired."

In *Freudenthal v. Espey,* 45 Colo. 488, 102 Pac. 280 the court said: "Nor is the contract unreasonable for the want of mutuality.  It is pregnant with mutual obligations, heretofore alluded to in the discussion as to its consideration.  Besides, we think it quite material that the contract has been partially executed."

In *Vogel v. Pekoc,* 157 Ill. 339, the court held that the contract was lacking in mutuality because there was no definite promise on the part of the employer to do anything.  In other words, that no binding promise whatever had been made on the part of the employer.  Of course, in such a case the employer could not claim that there was a binding obligation on the employee.

It is contended for the defendant that certain acts committed by the complainant warranted his discharge.  There is no doubt but that an employee, or superintendent, such as the complainant here, was bound within reason to carry out his obligations under the contract in question.  *Hamlin, Hale & Co. v. Race,* 78 Ill. 422; *Shields v. Carson,* 102 Ill. App., at page 46; *Alexander v. Potts,* 151 Ill. App. 587. In the contract it was provided that the complainant was "to act in all matters in accordance with the rules" of the "Company  *  *  *  ; not to advertise in any manner, shape or form any of the business of the Company  *  *  *  without first receiving the consent of the Executive Office of the Company."

502    APPELLATE COURTS OF ILLINOIS.

Brownholtz v. The Providers Life Assurance Co., 236 Ill. App. 494.

There was evidence introduced as to certain moneys collected by the complainant; that he deposited them in his own bank account instead of the company's bank account, and that he did some advertising. A letter was introduced in evidence dated May 1, 1916, purporting to be signed by Spiegel, which reads as follows: "I am congratulating you on the splendid report we received from your district for the week ending April 29." On June 24, 1916, the defendant wrote a letter, signed by Spiegel as general manager, to the complainant, notifying him that he was discharged. That letter charged that certain rejected applications had been rewritten and that the complainant by allowing the matter to escape his attention demonstrated his incompetency; that having confined himself almost entirely to colored business he had created discontent among his colored staff; that his bias and partiality had disrupted them; that he was late in furnishing his weekly reports; that the outlay for unnecessary medical inspections had been too great, and that during the month of May out of a total 500 industrial applications in his district, 175 of the 500 were rejected, which was a situation not fair to the company.

We have examined the evidence that pertains to the conduct of the complainant, bearing in mind the charges made, and agree with the master and the decree of the court. The defendant undertook, in making out its defense in justification of its discharge of the complainant, to show that the complainant had broken his contract. The evidence of the defendant itself, that is the letter of May 1, 1916, shows conclusively that up to that time the work of the complainant was cause for actual congratulation by the defendant, and what transpired after that, as the evidence shows it, in regard to applications rejected and rewritten, the disrupting of its staff, the banking of premiums, and the furnishing of weekly reports,

does not seem in any reasonable way to justify this court in setting aside the decree.

With reference to the accounting, the master in his report found that the last payment made to the complainant was made in June, 1916, and paid complainant's salary to June 15, 1916.

As to the amount due: This is a suit in equity for an accounting and, apparently, was tried on the theory that there were mutual accounts which justified equity in taking jurisdiction. No point is made that the court did not have jurisdiction. In those circumstances, as the actual amount that may be recovered which would be the same as if the suit were brought at law, the case of *Doherty v. Schipper & Block*, 250 Ill. 128, is instructive. In that case, where an employee for a fixed period was discharged without cause, the court said: "It is well settled that in case an employee is discharged without cause before his term of employment has expired and he has been paid in full up to the time when he is discharged, he may treat the contract of hiring as continuing and bring an action for a breach of the contract of employment against his employer for discharging him, and if the suit is not commenced, or if commenced before but not tried, until his term of employment has expired, he may recover the contract price of his wages, less what he has earned or by reasonable diligence could have earned in other employment subsequent to his discharge."

The master in his report found that the last payment made to the complainant was in June, 1916, and paid complainant's salary to June 15, 1916, figured at $40 per week; that the complainant was entitled to a salary of $40 per week from June 15, 1916, to February 18, 1917, which amounted to $1,440; that while in the employment of the defendant, the complainant advanced $43 for janitor service and sundry other items, and certain charges for renewals and

504    APPELLATE COURTS OF ILLINOIS.

Brownholtz v. The Providers Life Assurance Co., 236 Ill. App. 494.

on industrial insurance amounting to $88.75, making a total of $1,571.75. The master further found that the complainant had earned and was paid $150 in the course of the time that the contract in question was expiring and after he was discharged, and that he had collected $174.05 before he was discharged, but for which he had not accounted, and that the defendant was entitled to a credit for both of those items, making $324.05, leaving a principal balance due complainant of $1,247.70. To that amount the master added interest at 5 per cent from February 18, 1917, to June 8, 1922, in the sum of $330.95, making a total indebtedness due from the defendant to the complainant of $1,578.65.

It is contended that the chancellor erred in allowing $330.95, interest on the principal amount found due the complainant. Counsel for the complainant insists that interest is allowable, on the ground that the suit is on an instrument in writing. In our judgment, the document which was signed on December 10, 1915, did not in and of itself constitute a contract between the parties. The contract came into being after the company was chartered, and although the terms of the document were adopted, it cannot be said that there was any writing which in and of itself made the contract a written one. Its terms were adopted, but the writing did not constitute the contract. There being, therefore, no signed writing which in and of itself, by reason of the signatures thereto, constituted the contract, the case does not come within the terms of the statute, Chapter 74, sec. 2, Cahill's St. 1923. The statute provides that creditors shall be allowed interest on any "instrument of writing." That does not cover this case; nor do we think the claim for interest comes within any other provision of the statute, such as unreasonable and vexatious delay of payment. Further, the

amount was unliquidated. *Harvey v. Hamilton,* 155 Ill. 377.

We are of the opinion that the chancellor erred in allowing interest from the time of the plaintiff's discharge, and that the decree should have been for the complainant in the sum of $1,247.70, with interest from June 8, 1922, the date of the master's report. *Ruddy v. McDonald,* 244 Ill. 494; *Sharp v. Hull,* 81 Ill. App. 400; *Goodwin v. Bishop,* 145 Ill. 421; *Seacord v. Seacord,* 160 Ill. App. 328; *Sundstrom v. Weinrich,* 207 Ill. App. 313; section 3, ch. 74, Cahill's St. 1923.

The decree, therefore, will be modified by eliminating the interest of $330.95, reducing it in amount to the sum of $1,247.70, with interest as above provided. As so modified, the decree is affirmed. Costs in this court will be paid,—one-fifth by appellee and four-fifths by appellant.

*Decree modified and affirmed.*

O'CONNOR, P. J., and THOMSON, J., concur.